**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

| | | |
|---|---|---|
| **OHIO DEMOCRATIC PARTY** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:19-cv-3774** |
| | : | |
| **v.** | : | **JUDGE GRAHAM** |
| | : | |
| **FRANK LAROSE** | : | **Magistrate Judge Deavers** |
| | : | |
| **Defendant.** | : | |

---

**DEFENDANT SECRETARY OF STATE FRANK LAROSE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

---

Pursuant to the Court's August 30, 2019 Order, Doc. 3, Defendant Ohio Secretary of State LaRose hereby responds to Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction, Doc. 1-1.  Secretary LaRose respectfully requests that the Court deny Plaintiff's motion.  A memorandum in support is attached.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Brandi Laser Seskes*
BRANDI LASER SESKES (0077648)
HEATHER L. BUCHANAN (0083032)
ANN YACKSHAW (0090623)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Brandi.Seskes@ohioattorneygeneral.gov
Ann.Yackshaw@ohioattorneygeneral.gov

*Counsel for Defendant
Secretary of State Frank LaRose*

## I.      INTRODUCTION

Ohio Secretary of State Frank LaRose is committed to ensuring that all those who are eligible to vote in Ohio are registered to vote—and that they stay that way.  Thus, for the past several months, Secretary of State LaRose has widely publicized that on September 6, 2019, registrants will be removed from the voter rolls through Ohio's Voter Records Maintenance Program if *and only if*: (1) they have not voted in six years; and (2) they have not responded to multiple notices reminding them to confirm their registration.  To further assist individuals in confirming registration, Secretary LaRose created an online searchable "Registration Reset" list through which a person can determine whether he or she is going to be removed.  Directly under that list, he placed a link through which the person can click to quickly confirm their registration.  But he did not sit passively by and wait for individuals to come to the website; Secretary LaRose issued a press release informing the public of its existence (and the ability to quickly confirm registration), and on August 1, 2019, he made the entire list available to any person or group that wanted to assist him in his voter outreach efforts.  Notably, Plaintiff Ohio Democratic Party did not ask for the list.  It filed this lawsuit instead, a week before the scheduled removal and *a month* after Secretary LaRose made publicly available the list of names eligible for removal. Finally, in June 2019 Secretary LaRose directed Ohio's Boards of Elections to send a final "last chance" notice personally to each individual on the list, reminding each of the need to confirm registration.  He did not do this because Ohio law requires it.  He did it because with the June "last chance" notice, any person on the list will now have received *two* personal notices informing them that they were subject to removal and need to confirm their registration.

In spite of these efforts—and the months of widespread coverage they have received— Plaintiff the Ohio Democratic Party waited until four business days before the cancellations are to occur to do anything about them.  This is the case even though Ohio has been involved in

litigation over its voter roll maintenance for years.  *See Ohio A. Phillip Randolph Inst. v. Husted*, No. 2:16-cv-303 (S.D. Ohio Apr. 6, 2016), Doc. 1.  Through that litigation a settlement was reached that will allow any person whose registration is canceled through the Supplemental Process (a portion of the General Voter Records Maintenance Program) and is otherwise eligible under the terms of that settlement to cast a provisional ballot.  But even though the widely-publicized settlement will allow these individuals to vote provisionally, within a few hours of the settlement's finalization, Plaintiff filed its Complaint and requested a temporary restraining order to halt the entire General Voter Records Maintenance Program.

Persons identified through the Supplemental Process and removed under the General Voter Records Maintenance Program will have the opportunity to cast a provisional ballot.  Any Ohioan who is not registered to vote, either now or after September 6, has until October 7, 2019, to register to vote, even those who have now been told twice that they will be removed.  Plaintiff has offered no evidence to support its claim that the General Voter Records Maintenance Program, and Secretary LaRose's efforts to avoid anyone from being removed pursuant to it, will likely violate the law or cause irreparable harm justifying a temporary restraining order.  But evidence is not Plaintiff's only downfall.  As a matter of law, this Court lacks jurisdiction over Plaintiff's state-law claims and the Plaintiff lacks standing to obtain the relief sought through its motion for a temporary restraining order.  Because it has completely failed to meet its burden necessary for a TRO to issue, the Plaintiff's motion must be denied.

## II.    STATEMENT OF FACTS

Ohio's General Voter Records Maintenance Program is not new.  Since 1993, the National Voter Registration Act ("NVRA") has required States to "conduct a general program that makes a reasonable effort to remove the names" of those who are ineligible to vote "by reason of" death or change in residence.  52 U.S.C. § 20507(a)(4).  The NVRA sets forth "the

procedures that a State must follow before removing a registrant from the rolls on change-of-residence grounds." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1841 (2018). Specifically, the State may remove a registrant who "has failed to respond to a notice" and "has not voted or appeared to vote . . . during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice." 52 U.S.C. § 20507(d)(1)(B).

Ohio has developed two procedures to identify individuals who are ineligible to vote by reason of a change in residence—the National Change of Address Process ("NCOA") and the Supplemental Process. Under the NCOA Process, the Secretary sends notices to registrants that the United States Postal Service ("USPS") identifies as having moved. *See* Ohio Rev. Code § 3503.21(B), 52 U.S.C. § 20507(c)(1). This procedure "is undisputedly lawful." *Husted*, 138 S. Ct. at 1840.

But because many Ohioans do not inform the USPS when they move, Ohio also uses the Supplemental Process. Under the Supplemental Process, "Ohio identifies electors whose lack of voter activity indicates that they have moved." *Id.* at 1840 (quotation omitted). When a registrant chooses not to engage in any voter activity for a period of two consecutive years—for example, by failing to cast a ballot, sign a petition, file a voter-registration form, or update a voting address—Ohio mails that person a confirmation notice and asks him or her to confirm continued residence at that address. After sending these notices, Ohio removes registrants from the rolls only if they fail to return the confirmation card (or confirm or update their information online) *and* continue to avoid engaging in any voter activity for an additional period of four consecutive years, including two federal general elections. *Id.* at 1841. Removal from the rolls occurs only after "six years of nonvoting" and failure to respond to the confirmation notice. *Id.*

3

This process is undisputedly lawful. Just last year, after hearing a challenge to the process brought by the A. Philip Randolph Institute ("APRI"), the Supreme Court of the United States held that Ohio's Supplemental Process for removing names from the rolls on change-of-residence grounds complies with the NVRA. *See Husted*, 138 S. Ct. at 1848. The Court held that "Ohio's Supplemental Process follows [52 U.S.C. § 20507(d)] to the letter." *Id.* at 1842. "It is undisputed that Ohio does not remove a registrant on change-of-address grounds unless the registrant is sent and fails to mail back a return card and then fails to vote for an additional four years." *Id.*

After the U.S. Supreme Court's decision, only one issue remained pending in APRI's suit: a claim related to the sufficiency of the confirmation notices Ohio sent. *Ohio A. Phillip Randolph Inst. v. Husted*, No. 2:16-cv-303 (S.D. Ohio Sept. 27, 2018), Doc. 133. Just last week, the parties settled this claim. Declaration of Amanda M. Grandjean at ¶ 23, attachment H. The impact of that settlement agreement is dispositive of Plaintiff's request for a temporary restraining order.

The settlement agreement between APRI and the Secretary of State's office extends the so-called "APRI Exception" to allow the persons whose registrations are scheduled to be cancelled in September, and who did not re-register by the October 7, 2019 registration deadline, to still vote provisionally. A provisional ballot cast during the in-person absentee voting period or on Election Day by a person who is not registered to vote in Ohio may be counted if all of the following apply: (1) the individual's voter registration was cancelled in 2011, 2013, 2015, or 2019 pursuant to the Supplemental Process; (2) the person's provisional ballot affirmation reflects an address within that precinct and the person was previously registered to vote within that same county prior to cancellation; (3) the board of elections does not have information that the person was deceased, incarcerated on a felony conviction, or adjudicated as incompetent

4

under Ohio law by a county probate court after the individual's registration record was cancelled; and (4) the person's provisional ballot affirmation form and the ballot otherwise comply with all applicable laws and directives. *Id.* at ¶ 41. Individuals whose registrations are cancelled have plenty of time to utilize the "APRI Exception," as it does not expire until December 31, 2022. *Id.* at ¶ 40.

On the same day that this settlement was finalized and the stipulation of dismissal was filed, *see Ohio A. Phillip Randolph Inst. v. Husted*, No. 2:16-cv-303 (S.D. Ohio Aug. 30, 2019), Doc. 151—indeed, just a few hours later—the Ohio Democratic Party filed this suit. Its allegations relate to people whose registrations are scheduled to be cancelled as a result of the NCOA and Supplemental Processes conducted in 2015 (the same category of voters who will be allowed to vote pursuant to the APRI exception). By way of background, in May of 2015, the Secretary of State's office issued Directive 2015-09, which instructed boards of elections to conduct the NCOA and the Supplemental Process and to mail confirmation notices to registrants identified pursuant to those processes between June 15, 2015 and June 29, 2015. Dec. at ¶ 24. If registrants failed to either (1) respond to the confirmation notice, (2) update their registration, (3) update their address at the Ohio Bureau of Motor Vehicles ("BMV"), (4) vote, or (5) engage in voter activity, for a period of four years after the confirmation notice was mailed to them, that person's registration would be cancelled in September 2019. *Id.* at ¶ 24.

Wanting to give these individuals one last chance to remain registered to vote, Secretary LaRose instructed boards of elections to mail, by forwardable mail, a "last chance notice" to each person whose registration must be cancelled on September 6, 2019 pursuant to the NCOA or Supplemental Process conducted in 2015. *Id.* at ¶ 28. If a person responds to the notice, their registration will not be cancelled. *Id.* If a person does not respond, the person's registration will be cancelled on September 6, 2019.

5

But the Secretary did not stop there.  In June, Secretary LaRose announced that, for the first time, his Office was compiling a Registration Reset List of those registrants whose registrations were scheduled to be cancelled, and offered to provide the list to community organizations interested in ensuring that these individuals remain registered to vote.  *Id*. at ¶ 31. This list was published on the Secretary of State's website on August 1, 2019, and provided to the over twenty community organizations that requested it.  *Id*. at ¶ 32.  Plaintiff, the Ohio Democratic Party, never requested the list.  *Id*. at ¶ 34.

The Secretary is not required by law to conduct this outreach, but it is working.  *Id*. at ¶¶ 29, 33.  As of Friday, August 30, 2019, 11,393 of the individuals on the Registration Reset List who received "last chance notices" have become active registrants.  *Id*. at ¶ 33.  Nonetheless, Plaintiff maintains that the list of persons scheduled to be cancelled is "flawed" but offers no evidence to support this claim; rather, Plaintiff points to errors that already have been resolved. *See* Compl. at ¶¶ 1-5, Doc. 1; *see also* Dec. at ¶ 36.  Well before Plaintiff initiated this action, the Secretary of State's Office publicly addressed the errors that it discovered.  "Discrepancies in County Voter List Maintenance Data Discovered, Solved by Secretary of State's Office," Secretary of State Press Release, August 2, 2019, https://www.sos.state.oh.us/media-center/press-releases/2019/2019-08-02/ (accessed on September 1, 2019).  No person who was placed on the list due to those errors will have his or her voter registration cancelled.  Dec. at ¶ 37.  And county boards of elections that are holding a municipal primary election on September 10, 2019 have been instructed not to proceed with the cancellations until after the election.  *Id*. at ¶ 30.

But even if, after all of this outreach, individuals decide not to confirm their voter registration, there is still plenty of time to re-register after the removals occur.  The voter registration deadline for the November 5, 2019, general election is October 7, 2019—a full

month after the cancellations are scheduled. *Id*. at ¶ 39. In spite of all this, Plaintiff wants to halt the entire General Voter Records Maintenance Program, but not because it has presented any evidence that it has diverted any resources to address it—which is really its only claimed harm. Compl. at ¶¶ 9, 26. Its request must be rejected.

## III.   LAW AND ARGUMENT

### A.   Legal standard.

To obtain a temporary restraining order, Plaintiff must show: (1) it has a strong likelihood of success on the merits; (2) it would suffer irreparable injury absent the TRO; (3) issuance of a TRO would not cause substantial harm to others; and (4) the public interest would be served by issuance of a TRO. *See Project Vote v. Madison Cnty. Bd. of Elections,* No. 1:08-cv-2266, 2008 U.S. Dist. LEXIS 74016, at *18-19 (N.D. Ohio Sept. 29, 2008); *see also Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). The standard for granting a TRO matches the standard for a preliminary injunction "with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Doe v. Univ. of Cincinnati*, No. 1:15-cv-600, 2015 U.S. Dist. LEXIS 132864, at *3 (S.D. Ohio Sept. 30, 2015) (quotation omitted). The movants bear the burden of establishing their claim to a TRO, which "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citations omitted).

Here, the request for TRO must be considered in the elections context, where courts understand that "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Accordingly, the State's power to regulate its own elections—a power specifically reserved to it in the Constitution—is "substantial." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

**B.      Plaintiffs cannot show likelihood of success on the merits.**

None of Plaintiff's six claims are likely to succeed on the merits.  Plaintiff cannot show that the voter-maintenance process is fundamentally unfair and its due process claim fails. Plaintiff's First and Fourteenth Amendment claims fail because, under the *Anderson-Burdick* test, the Secretary's interest in following the NVRA and maintaining accurate voter rolls justifies any slight burden on voting.  Plaintiff's claim under the Help America Vote Act (HAVA) fails because no private cause of action exists to challenge a State's computerized voter registration list under 52 U.S.C. § 21083.  This claim would fail in any event because Ohio has adequate safeguards in place to ensure that eligible voters are not removed.  Finally, the Eleventh Amendment bars Plaintiff's three state-law claims.

**1.      Plaintiff lacks standing to sue.**

First and foremost, Plaintiff is unlikely to succeed on the merits of its claims because it has no standing to pursue them.  "Standing to pursue a claim is a threshold question in every federal case." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012).  "The burden of establishing standing is on the party seeking federal court action." *Id.* (internal quotations omitted).  Here, Plaintiff cannot satisfy this burden under either an independent-standing (injury to the organization) or organizational-standing (injury to members) theory.

To establish independent standing, Plaintiff must show that: (1) it has suffered "a concrete and particularized injury," whether actual or imminent; (2) the injury is traceable to the defendant; and (3) a favorable judgment will provide redress. *Morrison v. Bd. of Educ.*, 521 F.3d 602, 608 (6th Cir. 2008) (citing *Lujan*, 504 U.S. at 560-61).  Plaintiff fails to establish even the first element of independent standing—actual injury.  In its Complaint, Plaintiff asserts that it expends significant resources on voter registration and the upcoming cancellations threaten to force it to divert its resources to re-registering voters.  Compl. at ¶¶ 8-9.  Later, in its

Memorandum (but not in the Complaint), Plaintiff focuses on the loss of votes for its candidates and the loss of an individual's right to vote. TRO Mtn. at 7-8, Doc. 1-2 at PAGEID 27-28, Each of these injuries is speculative and unsupported by any evidence.

First, Plaintiff offers no allegations, let alone evidence, in support of its diversion of resources claim. It claims to conduct "significant" registration activities but fails to even allege what those activities are and how the cancellations might force Plaintiffs to alter them. Compl. at ¶ 8. The Secretary of State's Office already has identified exactly which persons are at risk of cancellation so that Plaintiff does not have to divert resources to identify them. Dec. at ¶ 31. Plaintiff cannot claim to have diverted resources to reach out to these individuals when it has not even bothered to ask for the list. *Id*. at ¶ 34.

Second, Plaintiff's attempt to assert standing on behalf of its members in its TRO Motion—but not its Complaint—must be rejected. In the TRO Motion, Plaintiff asserts that the cancellations threaten to impact the number of votes that its candidates receive and will disenfranchise its voters. But that is not what the Complaint says. The Complaint alleges only that the Ohio Democratic Party is "harmed" by the Supplemental Process because of its outreach efforts. Compl. at ¶¶ 9, 26. It does not allege that a single member of its organization may suffer injury and has standing to bring this action in his or her own right. This is unlikely because any such member *still has* until October 7, 2019, to register to vote.

But to obtain organizational standing, the Complaint must at least allege such an injury. An organization "may obtain 'standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs.*, 528 U.S. 167, 181 (2000)). A Plaintiff cannot later remedy this shortcoming. Organizational standing, like other forms of standing, is determined "by the facts as they existed when the action [was] brought." *Id.* (internal quotations omitted). Although a party may amend a complaint to "remedy inadequate jurisdictional allegations," it may not do so to remedy "defective jurisdictional facts." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989) (considering effect of 28 U.S.C. § 1653).

Simply put, the Plaintiff it is not entitled to a temporary restraining order based on a theory of harm not asserted in the Complaint. Even if it were, Plaintiff is asking this Court to assume—without any evidence—that registrants will be cancelled in error. And then, it asks this Court to assume that these persons will not re-register to vote before the October 7, 2019, voter registration deadline. Or, alternatively, that these individuals will not appear to vote during in-person absentee voting or on Election Day, or, if they do appear to vote, that they will fail to properly complete a provisional ballot. And, even if they do properly complete a provisional ballot, Plaintiff asks for the assumption that the board of elections will not count it. This daisy chain of speculation falls far short of establishing the right to stop the entire General Voter Records Maintenance Process.

### 2. Plaintiff's due process claim is entirely unsupported.

Plaintiff's due process claim is not likely to succeed on the merits. A plaintiff can state a due process claim under § 1983 "in the exceptional case where a state's voting system is fundamentally unfair." *Warf v. Bd. of Elections*, 619 F.3d 553, 559 (6th Cir. 2010) (quoting *League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008)). These due process claims succeed only in "exceptional" cases, such as when a State uses "'non-uniform rules, standards and procedures,' that result in significant disenfranchisement and vote dilution," or

significantly departs from previous state election practices. *Id.* (quoting *League of Women Voters*, 548 F.3d at 478). Plaintiff cannot show that this is the "exceptional" case.

First, far from a significant departure, the State's voter-maintenance process adheres to multiple decades of state election practices. Ohio has used the NCOA Process and the Supplemental Process since 1994, and these voter-maintenances processes have occurred under Secretaries of both political parties. *See Husted*, 138 S. Ct. at 1840. Although the Registration Reset list is new, *see* Directive 2019-09; Dec. at ¶ 31, the list *assists* persons in remaining on the rolls. Now, unlike the previous two decades, individuals can check the Registration Reset list online and can immediately update their registrations if they appear on the list. Additionally, the Registration Reset list enables outreach groups to contact individuals at risk of cancellation and urge them to take steps to remain registered. Dec. at ¶ 32.

Second, Plaintiff fails to show non-uniform rules, standards or procedures that will result in significant disenfranchisement or vote dilution. Plaintiff claims that "as many as 30,000" individuals appear on the Registration Reset list and could be wrongly cancelled, but offers no evidence to back up that assertion. TRO Mtn. at 6, Doc. 1-2 at PAGEID 26. Further, nothing is preventing the Plaintiff from providing that list—or even one name from it—to the Secretary so that he can work with the Plaintiff to prevent anyone on it from being cancelled in error. The Plaintiff is not entitled to a TRO simply because it is refusing to do so. Nor can Plaintiff show that any non-uniform practices led to any of those persons appearing on the Registration Reset list. In implementing the NCOA and Supplemental Process lists, the Secretary followed the precise procedures blessed only last year by the United States Supreme Court. *See generally Husted*, 138 S. Ct. 1833; Dec. at ¶ 22. While Plaintiff identifies some since-corrected errors in creating the list, it offers no evidence of as-yet uncorrected errors beyond its own speculation that such errors must exist. *See, e.g., Regan v. Vinick & Young*, 862 F.2d 896, 902 (1st Cir.

11

1988) ("Speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction."); *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007) (same).  And finally, Plaintiff cannot show that the voter-maintenance process will lead to any disenfranchisement. Any removed individual has the opportunity to re-register, and those cancelled under the Supplemental Process may cast provisional ballots through 2022 under the *APRI* settlement. Dec. at ¶¶ 40-41.

This is not the "exceptional" case in which a due process claim of fundamental unfairness in election systems will succeed on the merits and Plaintiff has failed to show otherwise.

### 3. Plaintiff's First and Fourteenth Amendment claims are likely to fail because Plaintiff cannot show any burden on voting.

Once again, Plaintiff's theory of harm in this case is *not* that the right to vote will be burdened, but that the Supplemental Process will require it to divert resources.  Compl. at ¶¶ 9, 26.  But even if some right-to-vote theory were properly before this Court, Plaintiff cannot show any severe burden on voting under the *Anderson-Burdick* balancing test.  Thus, First and Fourteenth Amendment claims cannot succeed on the merits.

When considering challenges to state election laws under the First and Fourteenth Amendments, the Court must first weigh the "character and magnitude" of the asserted injury to the rights protected by those amendments.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  Then, the Court weighs the precise interests put forward by the State as justifications for the burden, taking into consideration the extent to which those interests make it necessary to burden the Plaintiff's rights.  *Id.*  As the burden increases, so too must the regulation's importance in promoting the State's interests.  For severe burdens, the regulation must advance a compelling State interest in a narrowly-drawn

manner.  This test resembles that of strict scrutiny.  *See Ohio Council 8 Am. Fed'n of State, Cty. & Mun. Emps. v. Husted (AFSCME)*, 814 F.3d 329, 335 (6th Cir. 2016).  But for most laws, the presumption is that reasonable laws pass and that the State's justifications need not be compelling or narrowly drawn.  "[T]he State's important regulatory interests are generally sufficient to justify" reasonable and generally-applicable restrictions.  *Anderson*, 460 U.S. at 788.  Indeed, the Sixth Circuit has at times described the balancing as "closer to rational basis" review.  *AFSCME*, 814 F.3d at 335.

Here, no severe burden on voting exists.  Plaintiff claims that the upcoming voter-maintenance process will result in the removal of eligible registrants from the rolls.  Compl. at ¶¶ 41-42.  Because the registration cancellations will lead to disenfranchisement, Plaintiff argues that the voting burden is severe and triggers exacting scrutiny.  But Plaintiff's claim of disenfranchisement depends upon several layers of speculation unsupported by any evidence that cannot justify a temporary restraining order.  *See, e.g.*, *Regan v. Vinick & Young*, 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction."); *NACCO Material Users, Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943 (6th Cir. 2007) (same).

First, Plaintiff asks the Court to assume that individuals will, in fact, be removed from the rolls during the upcoming voter maintenance.  Plaintiff's evidence consists of previous errors in the Registration Reset list that the Secretary has since corrected, *see* Compl. at ¶ 20; Dec. at ¶ 36, and third-party allegations that the list includes some individuals listed as active on the Secretary's website and others who have voted in the past few years.  Compl. at ¶¶ 21-23.  A static list that has not changed since July, the Registration Reset list will necessarily include some persons who have since taken steps to remain on the rolls like returning the last-chance notice or updating their addresses.  Dec. at ¶ 33.  The voter-maintenance process on September 6

will include only those appearing on the Registration Reset list who have not taken steps to remain on the rolls. *Id*. at ¶ 24. Accordingly, Plaintiff can only speculate that the voter-maintenance process will remove eligible registrants.

Second, Plaintiff assumes that any person mistakenly removed on September 6 will not subsequently re-register before October 7, 2019, the registration deadline for the next election. Persons removed on September 6 can re-register online or in person. Additionally, voting-rights and other public-interest groups, including the League of Women Voters and the Ohio Republican Party, requested the Registration Reset list from the Secretary and can reach out to affected persons to urge them to re-register before the deadline. Dec. at ¶¶ 31-32. Thus, to establish that any eligible registrant will suffer a severe burden on the right to vote, Plaintiff must assume—without any evidence—that the registrant will not re-register before the applicable registration deadline.

Finally, in order to establish a burden on the right to vote, Plaintiff must assume that any person removed during the September 6 voter maintenance will flub the provisional ballot such that the board of elections will reject it. The settlement agreement reached in *A. Philip Randolph Inst. v. LaRose*, No. 2:16-cv-303 (S.D. Ohio), on August 28, 2019, allows any person removed in the Supplemental Process to cast a provisional ballot through 2022 if that person still resides in the same county reflected in the person's last registration address. Dec. at ¶¶ 40-41. And once a person casts a provisional ballot under the *APRI* settlement agreement, that person returns to the rolls in active status. *See id*. Plaintiff claims that the opportunity to cast a provisional ballot does not alleviate the burden on the right to vote because Ohio's boards of elections reject provisional ballots "due to trivial errors." Compl. at ¶ 43. Plaintiff is *not* challenging Ohio's provisional balloting framework. *See generally*, Complaint. But the Secretary has already instructed boards of elections not to reject provisional ballots for common, technical errors. Dec.

14

at ¶ 42.  To assume that a provisional ballot would not be counted under the *APRI* settlement, the Court must therefore assume that the individual will make an error on the provisional ballot or that the boards of elections will ignore the Secretary's instructions not to reject provisional ballots containing trivial errors, or both.

To conclude that the September 6 deadline to comply with the General Voter Records Maintenance Program will severely burden the right to vote through disenfranchisement the Court must make three layers of assumptions, none of which Plaintiff has supported.  Because the burden on First and Fourteenth Amendment rights is minimal, the State's "important regulatory interests" in following the NVRA and maintaining accurate voter rolls sufficiently justify the upcoming voter-maintenance process under the *Anderson-Burdick* test.

### 4.      Plaintiff's HAVA claim fails as a matter of law.

Plaintiff also fails to show any likelihood of success on its claim under HAVA, 52 U.S.C. § 21083(a)(4)(B) for inadequate safeguards "to ensure that eligible voters are not removed in error from the official list of eligible voters."  This claim cannot succeed because there is no private cause of action under § 21083.  Congress provided two ways to enforce this section of HAVA: (1) actions by the Attorney General of the United States for declaratory and injunctive relief, 52 U.S.C. § 21111, and (2) administrative complaints pursuant to 52 U.S.C. § 21112.  Accordingly, every court to consider the issue has concluded that no private cause of action exists under § 21083 to enforce HAVA's requirements relating to the computerized statewide voter registration list and that list's maintenance.  *See, e.g.*, *Bellito v. Snipes,* __F.3d__, 2019 U.S. App. LEXIS 25128, at *24-25 (11th Cir. Aug. 22, 2019) (concluding that § 21083 does not confer a private cause of action); *Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 184-85 (3d Cir. 2017) (same); *Story v. Hargett*, 2016 U.S. Dist. LEXIS 15339, at *2 (W.D. Tenn. Feb. 9, 2016) (same).  Although the Sixth Circuit held that plaintiffs could assert a

§ 1983 claim under another section of HAVA—52 U.S.C. § 21082—that decision does not control here. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572-73 (6th Cir. 2004). There, the court based its decision on language in § 21082 extending rights to individual voters, including an explicit reference to the "right of an individual to cast a provisional ballot." *Id*. No such language appears in § 21083, which refers to the systems *the state* must maintain and eschews any mention of individual rights.

But even if § 21083(a)(4)(B) somehow conferred on Plaintiff a private cause of action, Plaintiff cannot show that it is likely to succeed on this claim. The Secretary has put in place several safeguards to ensure that eligible persons are not removed in error from the official list of eligible voters. First, as required by § 21083(a)(4)(A), the Secretary removes only registrants who have not responded to a notice and who have not voted in two consecutive federal general elections thereafter, a process specifically approved by the Supreme Court. *See Husted*, 138 S. Ct. at 1843. Second, as an additional safeguard, the Secretary mailed last-chance notices to every individual set to be removed on September 6. The notices informed individuals the date on which their registrations would be cancelled and asked the recipient to either confirm their address or submit an updated address. Dec. at ¶ 28; Form 255-A-3, attachment M.

### 5. The Eleventh Amendment bars Plaintiff's state law claims.

Finally, Plaintiff's State law claims fail as a matter of law. Plaintiff brings claims for violations of Article V, Section 1 of the Ohio Constitution, Ohio Rev. Code § 3503.15(A)(5), and Ohio Rev. Code § 3503.21, all by way of 42 U.S.C. §1983. But the Eleventh Amendment bars the federal courts from exercising jurisdiction over pendent state law claims against the state and state officials sued in their official capacities. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984); *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc). "The federal courts are simply not open to such state law challenges to official state action, absent explicit

16

state waiver of the federal court immunity found in the Eleventh Amendment." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520–21 (6th Cir. 2007) (citations omitted). Ohio has not waived sovereign immunity. *McCormick v. Miami Univ.*, 693 F.3d 654 (6th Cir. 2012).

Plaintiff's claims do not fit within the exception to the State's sovereign immunity in *Ex Parte Young*, 209 U.S. 123 (1908). To determine whether the *Ex Parte Young* doctrine applies, the court "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of *federal law* and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (emphasis added) (quotation omitted). The *Ex Parte Young* exception does not apply because Plaintiff's complaint does not allege, with respect to the state-law claims, ongoing violations of *federal* law. Rather, these claims arise exclusively under state law. Compl. at ¶¶ 51-70 (citing the Ohio Constitution and Revised Code). Nor can Plaintiff invoke the *Ex Parte Young* exception by citing 42 U.S.C. § 1983 as a justification for the state-law claims. Section 1983 provides a cause of action for violations of *federal* law, not state law. *See Harris v. Lexington-Fayette Urban Cnty. Gov't*, 685 F. App'x 470, 473 (6th Cir. 2017) ("Moreover, § 1983 does not provide a remedy for alleged violations of state law . . . ."). Plaintiff simply cannot assert these state-law claims against Secretary LaRose in federal court.

## C. Plaintiff has not shown that, absent a TRO, it will be irreparably harmed.

Plaintiff claims that it "expends significant resources" in its voter registration efforts and activities, and, if the cancellations proceed, it stands to be harmed by having to divert its resources to ensure that these individuals re-register to vote. Compl. at ¶ 9. But Plaintiff can only speculate that it stands to be harmed.

Further, Plaintiff's claim that the cancellations threaten to harm certain individuals by disenfranchising them also is speculative and unsupported by evidence. In order to find any

harm, Plaintiff wants the Court to travel down a path of speculation. First, Plaintiff wants the Court to speculate that there are individuals whose registrations are scheduled to be cancelled in error on September 6. However, no evidence substantiating an existing error in the list has been offered by the Plaintiff. Instead, Plaintiff relies on assertions made by third parties and points to discrepancies that long-since have been identified, disclosed, and resolved. Compl. at ¶¶ 21, 23, 25; Dec. at ¶ 36. Second, we are to assume that a person whose voter registration is wrongly cancelled will not subsequently re-register by the voter registration deadline or utilize the APRI Exception to cast a ballot during in-person absentee voting or on Election Day. Finally, Plaintiff speculates that, even if a person who casts a ballot under the APRI Exception, the provisional ballot will not count because the individual will not complete it or the board will fail to review it correctly. Compl. at ¶¶ 16-17. Speculation of harm is not a substitute for evidence of harm and does not justify a TRO. *See, e.g.*, *Regan*, 862 F.2d at 902 ("Speculation or unsubstantiated fears about what may happen in the future cannot provide the basis for a preliminary injunction"). And in any event, Plaintiff neglected to plead in its Complaint that it sought relief on behalf of its members who may have their registrations cancelled. Compl. at ¶ 9. Plaintiff's Complaint only included allegations that Plaintiff itself would have to divert resources as a result of the cancellations. Plaintiff cannot now base its claim of irreparable harm on harm to its members.

> D.     **The balance of equities weighs heavily in the State's favor.**

Because Plaintiff has offered no evidence that anyone will suffer harm without the issuance of an injunction, the balance of equities tip in the State's favor. Plaintiff claims that some individuals will be mistakenly removed from the rolls and it will be therefore be forced to expend "considerable resources and volunteer-time it would otherwise devote to its other organizational activities due to these voter purges." TRO Mtn. at 9, Doc 1-2 at PAGEID 29. But as explained above, *supra* III.B.3 and III.C, Plaintiff put forward no evidence that it or anyone

would suffer a concrete harm as a result of the September 6 cancellations. And this claim is particularly specious here, where Plaintiff has not even *asked for* the official list that it would need to conduct such outreach. Plaintiff's argument that a TRO is necessary to prevent harm rests entirely on speculation. *See, e.g.*, *Regan*, 862 F.2d at 902; *NACCO Material Users,* 246 F. App'x at 943.

Meanwhile, the Secretary has an interest in and a legal duty to maintain accurate voter rolls, including removing from the voter rolls those who have moved. *See* 52 U.S.C. § 20507(a)(4) (mandating states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters"); Ohio Rev. Code § 3503.21(A)(7) (requiring the cancellation of a voter registration when the elector fails to respond to a notice and subsequently fails to vote for two consecutive federal general elections). Preventing the Secretary from maintaining accurate voter rolls thwarts the Secretary's compliance with these legal duties. Accordingly, the balance of the equities favors denial of the TRO.

### E. The public interest does not favor the entry of a TRO in the weeks leading up to an election.

The public interest does not favor the alteration of election processes in the weeks leading up to an election. In *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court vacated an injunction preventing Arizona's voter identification laws from taking effect just before a general election. The Court concluded that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id*. at 4-5. The closer the election looms, the larger the risk grows.

Here, the Secretary has widely publicized the upcoming voter-maintenance process. Each person whose registration will be cancelled received a last-chance notice in the mail

informing them of the September 6 voter maintenance. Dec. at ¶ 28. Further, the Secretary widely published the Registration Reset list, and over twenty community groups have also obtained the list. *Id*. at ¶ 32. Individuals may have checked the list online, and the outreach groups may have contacted still other voters to urge them to take steps to remain on the rolls. To halt the September 6 list maintenance would cause widespread confusion, causing persons to question whether they are registered and whether they need to take any action to remain so. Plaintiff has known about the September 6 list maintenance since late June, and it could have brought this case months ago. Drastically changing the list-maintenance process mere days before it takes effect does not serve the public interest. *See SEIU Local 1 v. Husted*, 698 F.3d 341, 345-46 (6th Cir. 2012) (noting that the public interest strongly disfavors last-minute changes to election procedures).

## IV. CONCLUSION

For these reasons, Defendant LaRose respectfully requests that this Court deny Plaintiff's motion for temporary restraining order.

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ Brandi Laser Seskes*
BRANDI LASER SESKES (0077648)
HEATHER L. BUCHANAN (0083032)
ANN YACKSHAW (0090623)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
Brandi.Seskes@ohioattorneygeneral.gov
Heather.Buchanan@ohioattorneygeneral.gov
Ann.Yackshaw@ohioattorneygeneral.gov

*Counsel for Defendant*
*Secretary of State Frank LaRose*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2019, the foregoing was filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance.  Parties may access this filing through the Court's system.

*/s/ Brandi Laser Seskes*
BRANDI LASER SESKES (0077648)
Principal Assistant Attorney General